IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SAUL SUBSIDIARY I LIMITED PARTNERSHIP | : : : | |
| v. | : : | Civil No. JKS 08-930 |
| BEST BUY STORES, L.P. | : : | |

## MEMORANDUM OPINION

Plaintiff Saul Subsidiary I Limited Partnership (Saul) brings this action against Defendant Best Buy Stores, L.P. (Best Buy). Count I charges Best Buy with breach of lease for failing to make full rental payments in accordance with its 15-year lease with Saul. Count II charges Best Buy with breach of lease for rent accruing through trial. Best Buy brings a counterclaim alleging that Saul breached the lease and that Best Buy is entitled to damages. Currently pending are Saul's Motion for Summary Judgment as to the counterclaim, Dkt. No. 63, and Saul's Motion for Partial Summary Judgment as to its claims. Dkt. No. 64. The motions have been briefed, and no hearing is deemed necessary. Local Rule 105.6. For the reasons stated below, Saul's motion on Best Buy's counterclaim, and Saul's motion as to liability, will be granted.

**I.   Background.**

The basic facts are uncontroverted or have been construed in the light most favorable to Best Buy, the non-moving party. On June 17, 1994, Saul, through its predecessor in interest, Saul Holdings I Limited Partnership, as Landlord, and Best Buy's predecessor in interest, Best Buy Co., Inc., as Tenant, entered into a fifteen year lease (Master Lease) for approximately 47,252 square feet of building area in the Seven Corners Shopping Center in Falls Church, Virginia (the Premises). Dkt. No. 65, Ex. A, pp. 11–13. The term of the Master Lease was from October 28, 1994 to October 31, 2009. *Id*. at p. 13. It required Best Buy to make base monthly

rental payments to Saul on the first day of the month, together with additional monthly rental payments for common area maintenance (CAM), commercial fees, taxes and other miscellaneous charges (collectively, rental payments). *Id*. at pp. 16, 31, 87.

Under the Master Lease, Saul is required, among other things, to maintain the Premises in a watertight condition and to repair, replace and maintain the exterior of the building, including the roof:

> Landlord shall make all structural repairs to the Premises, whether interior or exterior, keep the Premises watertight, and shall repair, replace and maintain in good condition the exterior of the Premises including without limitation the roof, roof membranes, walls, foundations, gutters, parking and drive areas, utility lines from the point of connection to the Premises to the main line, and downspouts.

*Id*. at p. 18. The parties agreed that if Saul fails to undertake and complete repairs required under the Master Lease, Best Buy is entitled to make the repairs itself and seek reimbursement from Saul. *Id*. If Saul's failure to comply with its maintenance obligation "results in an impairment in the operation of Tenant's business such that Tenant is forced to close for business in Tenant's commercially reasonable judgment, Tenant shall have the right to abate fixed rent and other charges during such period of impairment and closure." *Id*. at p. 20. If the impairment and closure continue and are uncured for thirty days, Best Buy may terminate the Master Lease. *Id*. The Master Lease gives Best Buy the right to sublet the Premises with Saul's approval and identifies an "Acceptable Replacement" tenant as "a user which is a national or regional merchant with at least five (5) stores open and operating . . . ." *Id*. at p. 29.

Best Buy operated a retail store at the Premises until 2002, when it vacated the Premises with approximately seven years remaining on the Master Lease. Dkt. No. 65, Ex. C, p. 3. On June 15, 2004, Best Buy, with Saul's approval, subleased the Premises to Amtec International,

Inc. (Amtec). Dkt. No. 65, Ex. A, p. 2; Ex. B, p. 5. The Amtec sublease term was to expire on October 15, 2009. *Id*. at p. 6. Amtec agreed to pay base monthly rent of $43,314.33 to Best Buy beginning on September 1, 2004, and to pay Best Buy, as additional rent, all taxes and CAM charges incurred for the Premises. *Id*. at p. 7. Amtec agreed to be subject to all of the terms, covenants and conditions contained in the Master Lease, *id*. at pp. 5–6, and that Best Buy was not liable for any of Saul's defaults under the Master Lease. *Id*. at p. 11. The sublease provided that if Best Buy breached the sublease based on a corresponding breach by Saul of the Master Lease, Amtec's sole remedy would be to pursue a claim in Best Buy's name against Saul. *Id*. at p. 12.

Beginning in July 2004, Amtec asked Saul to repair leaks in the roof. Dkt. No. 65, Ex. E, at p. 13. In April 2005, Amtec closed its business at the Premises and attempted to terminate the sublease due to Saul's alleged failure to repair leaks at the Premises. Dkt. No. 65, Ex. H. In response, Best Buy sent letters to Amtec on June 13, 2005, July 19, 2005, and November 14, 2005, denying that Amtec had the right to terminate the sublease. Dkt. No. 63, Exs. 8, 9, 10. Nevertheless, Amtec ceased making rental payments to Best Buy.

On August 14, 2006, Best Buy subleased the Premises to Rover Industries, Inc. (Rover). Dkt. No. 65, Ex. L, p. 4. The sublease allowed Rover to terminate at any time with 120 days' notice. *Id*. at p. 5. On July 19, 2007, Rover gave Best Buy notice of its intent to terminate as of November 30, 2007, because the "store is not performing up to our projections." Dkt. No. 65, Ex. M.

On June 13, 2007, Best Buy filed a complaint against both Amtec and Saul in Virginia state court, alleging that Amtec had breached the sublease by failing to pay rent and that Saul had

breached the Master Lease by failing to maintain and keep the roof watertight (the Virginia litigation). Dkt. No. 65, Ex. K. Best Buy sought judgments against both defendants for the damages Best Buy had sustained. *Id*. at ¶¶ 43-58. On November 15, 2007, Amtec filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Eastern District of Virginia, case number 07-13503, thus staying Best Buy's claim against it in the Virginia litigation. On April 14, 2008, Best Buy filed a Proof of Claim in Amtec's bankruptcy case seeking payment of $1,812,498.48 for "amounts due under sublease." Dkt. No. 63, Ex. 5, p. 1; Ex. 11. The worksheet that Best Buy included with its Proof of Claim shows that Best Buy was seeking payment for all rent, CAM charges and taxes due under the sublease from September 1, 2004 through November 15, 2007, minus credits for rent received from Rover Industries. Dkt. No. 63, Ex. 5, p. 2. Based on this claim, Best Buy received a payment of $23,950.89, its pro-rata share of the available proceeds from Amtec's bankruptcy estate. Dkt. No. 63, Ex. 5, pp. 5–6; Dkt. No. 63, Ex. 12.

In a letter dated January 31, 2008, Best Buy notified Saul that due to Saul's alleged default under the Master Lease for failing to make repairs, Best Buy was exercising its right to abate rent. Dkt. No. 65, Ex. O. Beginning on February 1, 2008, Best Buy stopped making rental payments. Dkt. No. 65, Ex. Q. In a letter dated February 13, 2008, Saul informed Best Buy that its January letter was ineffective notice, denied defaulting, and stated that Best Buy was not entitled to terminate the Master Lease. Dkt. No. 65, Ex. P. On March 10, 2008, Best Buy sent a letter notifying Saul of its immediate termination of the Master Lease. Dkt. No. 65, Ex. R.

On March 11, 2008, Saul brought an action against Best Buy in Maryland state court alleging breach of lease, which Best Buy removed to this court. Dkt. No. 1. On August 22,

2008, the Virginia court granted Best Buy's motion for a nonsuit of its Virginia case against Saul. Dkt. No. 65, Ex. T. On October 20, 2008, Best Buy filed a counterclaim in this case asserting that Saul breached the Master Lease and that Best Buy is entitled to recover the rent that Amtec, or subsequent potential subtenants, should have paid. Dkt. No. 37.

## II.     Standard of Review.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *See United States v. Diebold*, 369 U.S. 654, 655 (1962). The burden is on the moving party to demonstrate the absence of any genuine issue of material fact. *Pulliam Invest. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). A moving party who will not have the burden of proof at trial need only point to the insufficiency of the other side's evidence, thereby shifting the burden of raising a genuine issue of fact to the nonmoving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A party who will have the burden of proof at trial, on the other hand, must make a showing sufficient to establish the existence of the essential elements of its claim or defense. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003). To defeat the motion, the party opposing summary judgment must submit evidentiary materials showing facts on the basis of which the finder of fact could

reasonably decide the case in its favor. *Anderson*, 477 U.S. at 252. If a party fails to make a showing sufficient to establish the existence of an essential element on which that party will bear the burden of proof at trial, summary judgment is proper. *Id*.

## III. Discussion.

a. Saul's motion for summary judgment on Best Buy's counterclaim.

Best Buy's counterclaim alleges that Saul breached the Master Lease by failing to maintain the roof and keep the Premises watertight during Amtec's subtenancy. Dkt. No. 37, ¶¶ 27-31, 33. Best Buy contends that this failure by Saul constructively evicted Amtec from the premises. *Id*; Dkt. No. 65 at 7-12. Saul asserts that Best Buy's counterclaim is barred by judicial estoppel because Best Buy successfully asserted a factually inconsistent claim against Amtec in U.S. Bankruptcy Court. Saul is correct: Best Buy is barred by the doctrine of judicial estoppel from claiming that Saul constructively evicted Amtec and materially breached the Master Lease.

Under the doctrine of judicial estoppel, "where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position . . . ." *State of New Hampshire v. State of Maine*, 532 U.S. 742, 742 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)). The purpose of the doctrine is to prevent a party from "playing fast and loose" with the courts, and to protect the integrity of the judicial process. *Id.* at 750; *Allen v. Zurich Ins. Co*., 667 F.2d 1162, 1166 (4th Cir. 1982). For the doctrine to apply, three elements must be satisfied: (1) the party sought to be estopped has taken a different factual position in earlier litigation; (2) the earlier inconsistent position was accepted by the court; and (3) the party sought to be estopped must have "intentionally misled the court to gain unfair advantage." *Zinkand v. Brown*, 478 F.3d

634, 638 (4th Cir. 2007).  The third element is the "determinative factor," meaning that a court will not apply judicial estoppel "when a party's prior position was based on inadvertence or mistake."  *Id*.; *John S. Clark Co. v. Faggert & Frieden*, P.C., 65 F.3d 26, 29 (4th Cir. 1995).

The first element of judicial estoppel is present here.  The position Best Buy maintained in Amtec's bankruptcy proceeding was that the Amtec sublease was fully enforceable so that Amtec was liable to Best Buy for all unpaid rents and other charges due under that sublease.  In the present case, however, Best Buy intends to show that "due to the ongoing leaks at the Premises, Amtec was entitled to vacate the Premises and terminate the Sublease and Master Lease."  Dkt. No. 63, Ex. 13, p. 5.  Indeed, Best Buy offers no alternative basis for its contention that Saul is liable to Best Buy for rental payments not received from Amtec.  Dkt. No. 37 at ¶¶ 28-31; Dkt. No. 65 at pp. 7-12.  Best Buy's position here, that Amtec was entitled to terminate the sublease, is thus directly and factually inconsistent with its position in the bankruptcy case that Amtec was fully liable under the sublease.

The second element of judicial estoppel is also present.  The U.S. Bankruptcy Court accepted Best Buy's claim that Amtec was liable for all rent due under the sublease, awarding Best Buy its full pro-rata share of funds available to unsecured creditors.

Third, Best Buy's prior position—that the Amtec sublease was enforceable—was not based on inadvertence or mistake.  When Amtec attempted to terminate the sublease in 2005, Best Buy's attorneys responded with several letters rejecting the attempted termination.

Dkt. No. 63 at Exs. 8, 9, 10.[1]  When Amtec filed for bankruptcy protection in 2007, Best Buy continued to deny that the sublease had been validly terminated, asserting in its Proof of Claim that Amtec owed it all amounts due under sublease.  Best Buy's position in the U.S. Bankruptcy Court was not based on inadvertence or mistake, and its position in this case is thus intentionally, not inadvertently, inconsistent.

Two Fourth Circuit cases illustrate how the intent element operates to impose the doctrine of judicial estoppel.  In *Lowery v. Stovall*, 92 F.3d 219, 224 (4th Cir. 1996), the plaintiff had, in an earlier criminal case, pleaded guilty to attacking an officer with a key holder.  He then filed a civil suit against the officer, claiming that he did not attack the officer with the key holder.  The plaintiff's attempt to base his civil claim on the repudiation of his earlier confession constituted an intentional attempt to mislead the court to gain an unfair advantage.  *Id*. at 225.  Conversely, in *Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007), the plaintiff entered an *Alford* plea to resisting arrest without admitting guilt.  He then sued the arresting officer, alleging abuse of force.  Unlike Lowery, Zinkand had not intended to mislead but rather intended "to obtain the very favorable sentence against him and *to preserve the same position he asserts in this case*: that he did not give [the officer] the reason to use the force that caused his head injury."  *Id*. (emphasis added).  Thus, although Zinkand used both proceedings to his advantage, he did not alter his position to gain an *unfair* advantage.

Here, unlike in *Zinkand*, Best Buy did not preserve a consistent position in the U.S. Bankruptcy Court proceeding.  Rather, as in *Lowery*, Best Buy attempts to contradict its earlier

---

[1]  Best Buy advised Amtec that "[we] do not believe there has been a breach of the Sublease as a result of these alleged roof issues, particularly in light of the roof inspection report dated May 31, 2005 noting that the roof on the facility has a useful life of three to five more years."  Dkt. No. 63, Ex. 8.

successful position—that the Amtec sublease was enforceable—to now assert that Amtec was constructively evicted and thus had the right to vacate the Premises and terminate the sublease. Having received a payment from the bankruptcy trustee, Best Buy has already benefitted from its position in U.S. Bankruptcy Court, and now wants to benefit from a contradictory claim in this Court. Best Buy is estopped from potentially winning twice on the basis of these incompatible positions. *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990) (citing *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1167 (4th Cir. 1982) (further citations omitted)).

Best Buy's argument that its claim in the Bankruptcy Court was a legal, rather than a factual position, Dkt. No. 65, p. 14, is incorrect. Whether a roof leak is of sufficient severity to constitute constructive eviction is a question of fact, and Best Buy could only be paid in Amtec's bankruptcy case on the basis of the fact that the roof leak did not render the Amtec sublease unenforceable. If Best Buy was now permitted to show that the Amtec sublease was unenforceable, it would have accepted payment on a factually false Proof of Claim in the Bankruptcy Court.

Best Buy also argues that it asserted, in a separate Virginia litigation, the same claim it asserts here: that Saul's breach of the Master Lease led to Best Buy's damages in the form of lost rent from Amtec. However, the fact that Best Buy maintained a consistent claim in the Virginia case has no bearing on the estoppel created by the bankruptcy case. Judicial estoppel applies to an inconsistent position accepted by a prior court, without regard to whether a consistent position was taken in some other case, particularly where that consistent position was never accepted.

The position pertinent to the application of judicial estoppel here is the one Best Buy took in the U.S. Bankruptcy Court.

In sum, Best Buy's counterclaim cannot succeed unless Best Buy shows that Saul materially breached the Master Lease by constructively evicting Amtec from the Premises. Because Best Buy is estopped from making that showing, Saul is entitled to summary judgment on the counterclaim.[2]

    b.   *Saul's Claim that Best Buy Materially Breached the Lease*.

Saul contends that Best Buy materially breached the Master Lease by failing to make rental payments beginning February 1, 2008. Best Buy responds that it validly terminated the lease and was relieved of its obligation to pay rent because Saul failed to make the required repairs. Saul is entitled to summary judgment on the issue of liability for unpaid rent because there is no dispute of material fact that Best Buy's attempted termination breached the Master Lease.

When a party claims breach of contract, the contract itself becomes the law governing the case. *Palmer & Palmer Co. v. Waterfront Marine Constr., Inc.*, 276 Va. 285, 289, 662 S.E.2d 77, 80 (2008).[3] When a contract is unambiguous, the court must interpret it as written. *Id*; *Christopher Assocs., L.P. v. J.C. Sessoms*, Jr., 245 Va. 18, 22, 425 S.E.2d 795, 797 (1993) (when

---

[2] Even if Best Buy were permitted to show that Amtec had the right to terminate the sublease, neither Amtec nor Best Buy properly terminated the Master Lease. Amtec was not a party to the Master Lease, and merely notified Best Buy and Saul that it was terminating the sublease based on alleged leaks at the Premises. The Master Lease requires that the Tenant first close for business for 30 days and then may terminate if the alleged problem remains uncured, but Amtec sent the notice and closed for business at the same time. And Best Buy itself, of course, did not notify Saul of its intent to terminate the Master Lease until 2008, long after Amtec had vacated and after Best Buy had subleased the Premises to another Tenant.

[3] The Master Lease provides that it is governed by the laws of the Commonwealth of Virginia. Master Lease §§ 1, 35.10.

contract terms are clear and unambiguous, court looks only to the four corners of the instrument). Interpretation of a contract is a question of law.  *Palmer*, 276 Va. at 289.

The Master Lease obligates Best Buy to pay rent.  This obligation is material and Best Buy did not make the required rental payments beginning in February 2008.  Best Buy contends that it properly abated rent and terminated the Master Lease in accordance with Article 10 of the Master Lease:

> Notwithstanding anything contained in this Lease to the contrary, in the event of any failure of Landlord to comply with the provisions of this Article or those provisions contained in Article 27 of this Lease relating to Common Areas, and such failure ***results in an impairment of the operation of Tenant's business such that Tenant is forced to close for business in Tenant's commercially reasonable judgment***, Tenant shall have the right to abate fixed rent and other charges during such period of impairment and closure.  If such impairment and closure continues and remains uncured for a period in excess of thirty (30) days, Tenant may elect to terminate this Lease upon thirty (30) days prior written notice to Landlord unless, prior to the expiration of such period, Landlord has cured default.

(emphasis supplied).  Dkt. No. 65, Ex. A, p. 20.  Thus, if Saul's failure to repair the Premises forces Best Buy to "close for business," Best Buy is entitled to abate rent and, upon notice, ultimately terminate the Master Lease.

Best Buy asserts that the "business" it was forced to close was the business of subleasing the Premises.  Best Buy points to a dictionary definition of "business" as encompassing commercial dealing and to its retention of employees whose sole duties relate to subletting excess property.  The argument fails, however, because the Master Lease clearly defines the "business" to be conducted on the Premises less broadly.

The Master Lease does not permit Best Buy to operate *any* business out of the Premises. Rather, the Master Lease limits Tenant's use to a retail business that is open to the public.  The

Premises are located in a shopping center. Dkt. No. 65, Ex. A, pp. 12-13. The Lease commences on the "Tenancy Date," or the date Tenant *opens for business* to the public at the Premises. *Id*. at 13. An acceptable replacement tenant is a national or regional merchant *with stores that are open and operating*. *Id*. at 29. These provisions clarify that the Master Lease's use of the term "business" refers to the business of retail sales.

To be entitled to abate rent and terminate the Master Lease, the Tenant must close an ongoing retail business. That did not occur because there was no ongoing retail business on January 31, 2008, when Best Buy attempted to exercise its right to abate rent, or when it subsequently attempted to terminate the Master Lease.

Of course, even if "subletting" fell within the Master Lease's definition of "business," Best Buy's claim that it was unable to sublet the Premises because of Saul's alleged failure to maintain the Premises would fail. Best Buy presents no evidence of actual marketing efforts after July 2007, when it learned that Rover intended to vacate the Premises.[4] Best Buy alleges that its Director of Real Estate, Christie Crowe, retained a national broker to market the premises, but Crowe does not recall any details of the marketing effort for that time period. Dkt. 65, Ex. N, pp. 4-5. Phillip Ruxton, another broker retained by Best Buy, does not recall being asked to market the Premises or actually doing anything to market the Premises. Dkt. No. 66, Ex. 3, pp. 20-22, 33-35. Ruxton also does not have any records or communications regarding any actual marketing of the Premises during this time period. *Id*. at pp. 34-35. Best Buy has no evidence of active marketing efforts, and certainly no evidence that any such efforts were curtailed by the condition of the Premises.

---

[4] Rover's stated reason for vacating was its store's performance.

In sum, Best Buy did not validly terminate the lease as of February 1, 2008. Saul is entitled to summary judgment as to liability for Best Buy's material breach of the lease, with damages yet to be ascertained.

**IV.     Conclusion.**

For the foregoing reasons, Saul's motion for summary judgment on Best Buy's counterclaim will be granted, and Saul's motion for partial summary judgment on its breach of lease claim against Best Buy will also be granted.


Date:  October 14, 2009                                    /S/
                                                    JILLYN K. SCHULZE
                                                    United States Magistrate Judge